1  BILAL A. ESSAYLI
   Acting United States Attorney
2  CHRISTINA T. SHAY
   Assistant United States Attorney
3  Chief, Criminal Division
   NISHA CHANDRAN (Cal. Bar No. 325345)
4  Assistant United States Attorney
   Major Frauds Section
5  JENNA G. WILLIAMS (Cal. Bar No. 307975)
   Transnational Organized Crime Section
6        1100 United States Courthouse
         312 North Spring Street
7        Los Angeles, California 90012
         Telephone: (213) 894-2429
8        Facsimile: (213) 894-0241
         E-mail:   Nisha.Chandran@usdoj.gov
9
   LORINDA I. LARYEA
10 Acting Chief, Fraud Section
   Criminal Division, U.S. Department of Justice
11 THEODORE M. KNELLER (D.C. Bar No. 978680)
   ADAM L.D. STEMPEL (D.C. Bar No. 1615015)
12 Trial Attorneys, Fraud Section
   Criminal Division, U.S. Department of Justice
13       1400 New York Avenue, NW
         Washington, DC 20530
14       Telephone: (202) 514-5799
         Facsimile: (202) 514-3708
15       Email: Theodore.Kneller@usdoj.gov

16 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

17

                   FILED
             CLERK, U.S. DISTRICT COURT

                 8/20/25

             CENTRAL DISTRICT OF CALIFORNIA
             BY: ____MRV____ DEPUTY

18                  UNITED STATES DISTRICT COURT

19              FOR THE CENTRAL DISTRICT OF CALIFORNIA

20 UNITED STATES OF AMERICA,          No. 2:25-cr-00200(A)-SVW

21          Plaintiff,

22                                    PLEA AGREEMENT FOR DEFENDANT
               v.                     JOSEPH NEAL SANBERG

23 JOSEPH NEAL SANBERG,

24          Defendant.

25       1.   This constitutes the plea agreement between JOSEPH NEAL

26 SANBERG ("defendant") and the United States Attorney's Office for the

27 Central District of California (the "USAO") and the Fraud Section of

28 the Department of Justice's Criminal Division (the "DOJ") in the

1    above-captioned case.  This agreement is limited to the USAO and DOJ

2    (collectively referred to herein as the "United States") and cannot

3    bind any other federal, state, local, or foreign prosecuting,

4    enforcement, administrative, or regulatory authorities.

5                            DEFENDANT'S OBLIGATIONS

6        2.   Defendant agrees to:

7             a.   Give up the right to indictment by a grand jury and,

8    at the earliest opportunity requested by the United States and

9    provided by the Court, appear and plead guilty to counts one and two

10   of the first superseding information in United States v. Joseph Neal

11   Sanberg, CR No. 2:25-cr-00200(A)-SVW, in the form attached to this

12   agreement as Exhibit A or a substantially similar form, which charges

13   defendant with a wire fraud, in violation of 18 U.S.C. § 1343.

14            b.   Not contest facts agreed to in this agreement.

15            c.   Abide by all agreements regarding sentencing contained

16   in this agreement.

17            d.   Appear for all court appearances, surrender as ordered

18   for service of sentence, obey all conditions of any bond, and obey

19   any other ongoing court order in this matter.

20            e.   Not commit any crime; however, offenses that would be

21   excluded for sentencing purposes under United States Sentencing

22   Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

23   within the scope of this agreement.

24            f.   Be truthful at all times with the United States

25   Probation and Pretrial Services Office and the Court.

26            g.   Pay the applicable special assessments at or before

27   the time of sentencing unless defendant has demonstrated a lack of

28   ability to pay such assessments.

h.   Agree that any and all criminal debt ordered by the Court will be due in full and immediately.  The United States is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

i.   Complete the Financial Disclosure Statement on a form provided by the United States and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the United States by either email at usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 312 North Spring Street, 11th Floor, Los Angeles, CA 90012.  Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j.   Authorize the United States to obtain a credit report upon returning a signed copy of this plea agreement.

k.   Consent to the United States inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

3.   Defendant further agrees:

a.   To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, or involved in the illegal activity to which defendant is pleading guilty, specifically including, but not limited to, the following:

i.   $138.50 seized from Bank of America account 3251-5678-8058 (Consolidated Asset Tracking System ID ("CATS ID") 25-FBI-003506);

ii.  $605.91 seized from Bank of America account 3830-2602-6099 (CATS ID 25-FBI-003502);

iii. $2,187.68 seized from Bank of America account 3940-0164-7725 (CATS ID 25-FBI-003504);

iv.  $9,190.53 seized from Bank of America account 0094-5480-1102 (CATS ID 25-FBI-003505); and

v.   All funds, securities, or negotiable instruments, seized from Bank of America Account 41-01-100-0166771 (CATS ID 25-FBI-003501, collectively, the "Forfeitable Property").

b.   To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Property and to the forfeiture of the property.

c.   That the Preliminary Order of Forfeiture shall become final as to the defendant upon entry.

d.   To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

e.   Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Property.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Property on behalf of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees

4

to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Property. Defendant further waives any and all notice requirements of 18 U.S.C. § 983(a)(1)(A).

f.    Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

g.    Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

h.    To prevent the transfer, sale, destruction, or loss of the Forfeitable Property to the extent defendant has the ability to do so.

i.    To fill out and deliver to the United States a completed financial statement listing defendant's assets on a form provided by the USAO.

j.    That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

k.    To the entry as part of defendant's guilty plea of a personal money judgment of forfeiture against defendant in the amount of $6,650,000.00, which sum defendant admits was derived from proceeds traceable to the violations described in the factual basis of the plea agreement.  Defendant understands that the money judgment of forfeiture is part of defendant's sentence and is separate from any fines or restitution that may be imposed by the Court.

l.    That with respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture at sentencing, and incorporation of

the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property and the money judgment of forfeiture in any proceeding on any grounds including, without limitation, that the forfeiture of the Forfeitable Property or the money judgment of forfeiture constitute an excessive fine or punishment.  Defendant acknowledges that the forfeiture of the Forfeitable Property and the money judgment of forfeiture are part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty pleas.

THE UNITED STATES' OBLIGATIONS

4.    The United States agrees to:

a.    Not contest facts agreed to in this agreement.

b.    Abide by all agreements regarding sentencing contained in this agreement.

c.    At the time of sentencing, move to dismiss the underlying indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.  Defendant further agrees that he may be treated as if he had been convicted of the dismissed charges for purposes of U.S.S.G. § 1B1.2(c), regardless of whether the factual basis below would be sufficient to satisfy all elements of each

1  charge.  Defendant waives the right to challenge the sufficiency of

2  the factual basis as to any element of any dismissed charge.

3       d.  At the time of sentencing, provided that defendant

4  demonstrates an acceptance of responsibility for the offenses up to

5  and including the time of sentencing, and the conditions set forth in

6  paragraph 2 through 3 are met and defendant has not committed, and

7  refrains from committing, acts constituting obstruction of justice

8  within the meaning of U.S.S.G. § 3C1.1, as discussed below,

9  recommend a two-level reduction in the applicable Sentencing

10 Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend

11 and, if necessary, move for an additional one-level reduction if

12 available under that section.

13      e.  Not seek a sentence of imprisonment above the high end

14 of the applicable Sentencing Guidelines range corresponding to an

15 offense level of 36 and the criminal history category calculated by

16 the Court.  For purposes of this agreement, the high end of the

17 Sentencing Guidelines range is that defined by the Sentencing Table

18 in U.S.S.G. Chapter 5, Part A.  The parties also agree that the

19 government may respond to a request by defendant for a sentence below

20 the government's recommendation.

21 <u>NATURE OF THE OFFENSES</u>

22    5.  Defendant understands that for defendant to be guilty of

23 the crime charged in counts one and two in the first superseding

24 information, that is, wire fraud, in violation of Title 18, United

25 States Code, Section 1343, the following must be true for each count:

26 (1) defendant knowingly devised a scheme or plan to defraud, or a

27 scheme or plan for obtaining money or property by means of false or

28 fraudulent pretenses, representations, or promises, or omitted facts;

7

(2) the statements made, or facts omitted, as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

<u>PENALTIES AND RESTITUTION</u>

6.    Defendant understands that the statutory maximum sentence that the Court can impose for each violation of Title 18, United States Code, Section 1343, is: 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

7.    Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 40 years imprisonment; a 3-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $200.

8.    Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offenses to which defendant is pleading guilty.  Defendant agrees that, in return for the United States' compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the counts to which defendant is pleading guilty.  In particular, defendant agrees that

the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offenses to which defendant is pleading guilty.  The parties currently believe that the applicable amount of restitution is approximately $248,703,886.00, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

9.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

10.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated

1  collateral consequences will not serve as grounds to withdraw

2  defendant's guilty pleas.

3      11.   Defendant and his counsel have discussed the fact that, and

4  defendant understands that, if defendant is not a United States

5  citizen, the convictions in this case make it practically inevitable

6  and a virtual certainty that defendant will be removed or deported

7  from the United States.  Defendant may also be denied United States

8  citizenship and admission to the United States in the future.

9  Defendant understands that while there may be arguments that

10  defendant can raise in immigration proceedings to avoid or delay

11  removal, removal is presumptively mandatory and a virtual certainty

12  in this case.  Defendant further understands that removal and

13  immigration consequences are the subject of a separate proceeding and

14  that no one, including his attorney or the Court, can predict to an

15  absolute certainty the effect of his convictions on his immigration

16  status.  Defendant nevertheless affirms that he wants to plead guilty

17  regardless of any immigration consequences that his pleas may entail,

18  even if the consequence is automatic removal from the United States.

19                          FACTUAL BASIS

20      Defendant admits that defendant is, in fact, guilty of the

21  offenses to which defendant is agreeing to plead guilty.  Defendant

22  and the United States agree to the statement of facts provided in the

23  factual basis included as Attachment A to this plea agreement and

24  agree that this statement of facts is sufficient to support pleas of

25  guilty to the charges described in this agreement and to establish

26  the Sentencing Guidelines factors set forth in paragraph 13 below,

27  but is not meant to be a complete recitation of all facts relevant to

28

the underlying criminal conduct or all facts known to either party that relate to that conduct.

SENTENCING FACTORS

12.   Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other Section 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

13.   Defendant and the United States agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base offense level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss greater than $150 million: | +26 | U.S.S.G. § 2B1.1(b)(1)(N) |
| 10 or more victims: | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(i) |
| Offense involved sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense: | +2 | U.S.S.G. § 2B1.1(b)(17)(A) |

The United States will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an

11

additional one-level downward adjustment under U.S.S.G. § 3E1.1(b))
only if the conditions set forth in paragraph 2 through 3 are met and
if defendant has not committed, and refrains from committing, acts
constituting obstruction of justice within the meaning of U.S.S.G.
§ 3C1.1, as discussed below.  The parties agree that defendant did
not use violence or credible threats of violence in connection with
the offense.  Subject to paragraph 28 below, defendant and the United
States agree not to seek, argue, or suggest in any way, either orally
or in writing, that any other specific offense characteristics,
adjustments, or departures relating to the offense level be imposed,
except that either party may seek or oppose, and argue for or against
the applicability of a zero-point offender adjustment under U.S.S.G.
§ 4C1.1.  If, however, the U.S. Probation Office finds in preparing
the Presentence Report that the zero-point offender adjustment does
not apply for any reason including because (i) the defendant
personally caused substantial financial hardship, or (ii) defendant
should receive an adjustment for aggravating role under U.S.S.G. §
3B1.1, the United States may concur with Probation's findings if
asked by the Court.  Defendant agrees, however, that if, after
signing this agreement, but prior to sentencing, defendant were to
commit an act, or the United States were to discover a previously
undiscovered act committed by defendant prior to signing this
agreement, which act, in the judgment of the United States,
constituted obstruction of justice within the meaning of U.S.S.G.
§ 3C1.1, the United States would be free to seek the enhancement set
forth in that section and to argue that defendant is not entitled to
a downward adjustment for acceptance of responsibility under U.S.S.G.
§ 3E1.1.

1    14.   Defendant understands that there is no agreement as to

2    defendant's criminal history or criminal history category.

3    15.   Subject to paragraph 4(e) above, defendant and the United

4    States reserve the right to argue for a sentence outside the

5    sentencing range established by the Sentencing Guidelines based on

6    the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3),

7    (a)(6), and (a)(7).

8                    WAIVER OF CONSTITUTIONAL RIGHTS

9    16.   Defendant understands that by pleading guilty, defendant

10   gives up the following rights:

11          a.   The right to persist in a plea of not guilty.

12          b.   The right to a speedy and public trial by jury.

13          c.   The right to be represented by counsel -- and if

14   necessary have the Court appoint counsel -- at trial.  Defendant

15   understands, however, that, defendant retains the right to be

16   represented by counsel -- and if necessary have the Court appoint

17   counsel -- at every other stage of the proceeding.

18          d.   The right to be presumed innocent and to have the

19   burden of proof placed on the United States to prove defendant guilty

20   beyond a reasonable doubt.

21          e.   The right to confront and cross-examine witnesses

22   against defendant.

23          f.   The right to testify and to present evidence in

24   opposition to the charges, including the right to compel the

25   attendance of witnesses to testify.

26          g.   The right not to be compelled to testify, and, if

27   defendant chose not to testify or present evidence, to have that

28   choice not be used against defendant.

13

h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

17.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

<u>WAIVER OF APPEAL AND COLLATERAL ATTACK</u>

18.  Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, including, to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (e) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

19.  Defendant also gives up any right to bring a post-conviction collateral attack on the convictions or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

20.  This agreement does not affect in any way the right of the United States to appeal the sentence imposed by the Court.

WAIVER OF RIGHTS CONCERNING PLEA COLLOQUY AND FACTUAL BASIS

21.  Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing; (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

22.  Defendant further agrees that this paragraph of the agreement is severable.  Thus, defendant's waivers are binding and effective even if, subsequent to defendant's signing this agreement,

15

1  defendant declines to plead guilty, the Court declines to accept his

2  guilty plea, or, if this agreement is of the type described in

3  Federal Rule of Criminal Procedure 11(c)(1)(A) or (c)(1)(C), the

4  Court rejects this agreement.  Defendant also agrees that his waivers

5  are binding and effective even if some other portion of this

6  agreement is found to be invalid by this Court or the Ninth Circuit.

7                    RESULT OF WITHDRAWAL OF GUILTY PLEAS

8      23.  Defendant agrees that if, after entering guilty pleas

9  pursuant to this agreement, defendant seeks to withdraw and succeeds

10 in withdrawing defendant's guilty pleas on any basis other than a

11 claim and finding that entry into this plea agreement was

12 involuntary, then the United States will be relieved of all of its

13 obligations under this agreement and should the United States choose

14 to pursue any charge that was either dismissed or not filed as a

15 result of this agreement, then (i) any applicable statute of

16 limitations will be tolled between the date of defendant's signing of

17 this agreement and the filing commencing any such action; and

18 (ii) defendant waives and gives up all defenses based on the statute

19 of limitations, any claim of pre-indictment delay, or any speedy

20 trial claim with respect to any such action, except to the extent

21 that such defenses existed as of the date of defendant's signing this

22 agreement.

23                    EFFECTIVE DATE OF AGREEMENT

24     24.  This agreement is effective upon signature and execution of

25 all required certifications by defendant, defendant's counsel, and an

26 attorney for the United States.

27

28

1

## BREACH OF AGREEMENT

2     25.  Defendant agrees that if defendant, at any time after the

3  effective date of the agreement, knowingly violates or fails to

4  perform any of defendant's obligations under this agreement ("a

5  breach"), the United States may declare this agreement breached.  All

6  of defendant's obligations are material, a single breach of this

7  agreement is sufficient for the United States to declare a breach,

8  and defendant shall not be deemed to have cured a breach without the

9  express agreement of the United States in writing.  If the United

10  States declares this agreement breached, and the Court finds such a

11  breach to have occurred, then:

12     a.  If defendant has previously entered guilty pleas

13  pursuant to this agreement, defendant will not be able to withdraw

14  the guilty pleas.

15     b.  The United States will be relieved of all its

16  obligations under this agreement; in particular, the United States:

17  will no longer be bound by any agreements (i) concerning sentencing

18  and will be free to seek any sentence up to the statutory maximum for

19  the crimes to which defendant has pleaded guilty; and (ii) regarding

20  criminal prosecution, and will be free to criminally prosecute

21  defendant for any crime, including charges that the United States

22  would otherwise have been obligated to dismiss pursuant to this

23  agreement.

24     c.  The United States will be free to criminally prosecute

25  defendant for false statement, obstruction of justice, and perjury

26  based on any knowingly false or misleading statement by defendant.

27     26.  Following the Court's finding of a knowing breach of this

28  agreement by defendant, should the United States choose to pursue any

17

charge that was either dismissed or not filed as a result of this
agreement, then:

> a.    Defendant agrees that any applicable statute of
limitations is tolled between the date of the defendant's signing of
this agreement and the filing commencing any such action.

> b.    Defendant waives and gives up all defenses based on
the statute of limitations, any claim of pre-indictment delay, or any
speedy trial claim with respect to any such action, except to the
extent that such defenses existed as of the date of defendant's
signing this agreement.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

27.    Defendant understands that the Court and the United States
Probation and Pretrial Services Office are not parties to this
agreement and need not accept any of the United States' sentencing
recommendations or the parties' agreements to facts or sentencing
factors.

28.    Defendant understands that both defendant and the United
States are free to: (a) supplement the facts by supplying relevant
information to the United States Probation and Pretrial Services
Office and the Court, (b) correct any and all factual misstatements
relating to the Court's Sentencing Guidelines calculations and
determination of sentence, and (c) argue on appeal and collateral
review that the Court's Sentencing Guidelines calculations and the
sentence it chooses to impose are not error, although each party
agrees to maintain its view that the calculations in paragraph 13 are
consistent with the facts of this case.  While this paragraph permits
both the United States and defendant to submit full and complete

factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the United States' obligations not to contest the facts agreed to in this agreement.

29.    Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

30.    Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the United States and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

//

//

1                    PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2          31.   The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    BILAL A. ESSAYLI
     Acting United States Attorney

9
     DEPARTMENT OF JUSTICE
10   CRIMINAL DIVISION

11   LORINDA I. LARYEA
     Acting Chief, Fraud Section

12

13                                                       August 20, 2025

14   NISHA CHANDRAN                         Date
     JENNA G. WILLIAMS
15   Assistant United States Attorneys

16   THEODORE M. KNELLER
     ADAM L.D. STEMPEL
17   Trial Attorneys, Fraud Section
     Department Of Justice
18   Criminal Division

19

20

21                                                       August 15, 2025

22   JOSEPH NEAL SANBERG                    Date
     Defendant

23                                                       August 18, 2025

24   BRIAN R. MICHAEL                       Date
     MARC L. MUKASEY
25   Attorneys for Defendant JOSEPH NEAL
     SANBERG

26

27

28

                                    20

1                          CERTIFICATION OF DEFENDANT

2          I have read this agreement in its entirety.  I have had enough

3    time to review and consider this agreement, and I have carefully and

4    thoroughly discussed every part of it with my attorney.  I understand

5    the terms of this agreement, and I voluntarily agree to those terms.

6    I have discussed the evidence with my attorney, and my attorney has

7    advised me of my rights, of possible pretrial motions that might be

8    filed, of possible defenses that might be asserted either prior to or

9    at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10   of relevant Sentencing Guidelines provisions, and of the consequences

11   of entering into this agreement.  No promises, inducements, or

12   representations of any kind have been made to me other than those

13   contained in this agreement.  No one has threatened or forced me in

14   any way to enter into this agreement.  I am satisfied with the

15   representation of my attorney in this matter, and I am pleading

16   guilty because I am guilty of the charges and wish to take advantage

17   of the promises set forth in this agreement, and not for any other

18   reason.

19

20   _____        ___August 15, 2025_____
     JOSEPH NEAL SANBERG                         Date
21   Defendant

22

23

24

25

26

27

28

1          <u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

2          I am JOSEPH NEAL SANBERG's attorney.  I have carefully and

3   thoroughly discussed every part of this agreement with my client.

4   Further, I have fully advised my client of his rights, of possible

5   pretrial motions that might be filed, of possible defenses that might

6   be asserted either prior to or at trial, of the sentencing factors

7   set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8   provisions, and of the consequences of entering into this agreement.

9   To my knowledge: no promises, inducements, or representations of any

10  kind have been made to my client other than those contained in this

11  agreement; no one has threatened or forced my client in any way to

12  enter into this agreement; my client's decision to enter into this

13  agreement is an informed and voluntary one; and the factual basis set

14  forth in this agreement is sufficient to support my client's entry of

15  guilty pleas pursuant to this agreement.

16  _____          _____
                                                  August 18, 2025
17  BRIAN R. MICHAEL                              Date
    MARC L. MUKASEY
18  Attorneys for Defendant JOSEPH NEAL
    SANBERG

1

**ATTACHMENT A – FACTUAL BASIS**

2       Defendant acknowledges that if this case proceeded to trial, the

3  United States would prove the following facts, among others, which

4  defendant acknowledges to be true, beyond a reasonable doubt.

5       At times relevant to this factual basis:

6  **I.    Background**

7                    Relevant Entities and Individuals

8       1.   JOSEPH NEAL SANBERG ("defendant") was the co-founder of

9  Company A, and, at various times, was Company A's largest shareholder

10  and served on Company A's board of directors.

11      2.   Company A maintained its principal office in Los Angeles

12  County, California.

13      3.   Investor Fund A was a private credit fund that made a loan

14  to defendant.

15      4.   Investor Fund B was a private credit fund that made a loan

16  to defendant.

17      5.   Co-Schemer Ibrahim Ameen AlHusseini was a resident of Los

18  Angeles, California and served on the board of directors of

19  Company A.

20      6.   Investment Adviser 1 was an investment adviser to Investor

21  Fund A and Investor Fund B.

22      7.   Individual 1 solicited potential investors and lenders on

23  behalf of defendant.

24      8.   Investment Manager 1 managed one or more investment funds

25  that made a loan to defendant.

26      9.   Sanberg Entity 1 was a closely held legal entity, which had

27  one or more bank accounts controlled by defendant.

28

10.   Sanberg Entity 2 was a closely held legal entity, which had one or more bank accounts controlled by defendant.

11.   LOI Customer 1 was an entity that defendant presented to Company A as a bona fide customer.

12.   Employee 1 was an officer of Company A.

<u>Overview of Scheme to Defraud</u>

13.   Beginning no later than in or around January 2020, and continuing through in or about February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant and others knowingly and with intent to defraud, devised, intended to devise, and participated in a scheme to defraud lenders and investors and to obtain money and property from those lenders and investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

**II.   <u>False and Fraudulent Representations to Lenders</u>**

14.   Beginning no later than in or around January 2020, defendant negotiated terms for a loan from Investor Fund A of approximately $55 million (the "Investor Fund A Loan") for the benefit of defendant and others.  Under the terms of the Investor Fund A Loan, defendant pledged approximately 10.3 million shares of Company A stock as collateral.

15.   To secure the Investor Fund A Loan, defendant and co-schemer Ibrahim Ameen AlHusseini arranged a separate financial transaction (a put option agreement) between co-schemer AlHusseini and Investor Fund A.  The put option agreement purported to act as a type of financial guarantee by obligating co-schemer AlHusseini to purchase the Company A stock posted as collateral from Investor

Fund A for tens of millions of dollars if defendant defaulted on the loan.

16.    Defendant and co-schemer AlHusseini knowingly and intentionally made, and caused to be made, materially false and fraudulent representations to Investor Fund A and Investment Adviser 1 that co-schemer AlHusseini had sufficient liquid assets to pay tens of millions of dollars for the shares of Company A stock in the event of defendant's default.  In truth and in fact, co-schemer AlHusseini did not have sufficient liquid assets to cover the obligations in the put option agreement if defendant defaulted on the loan.  Defendant knew that the put option agreement was a material term of the Investor Fund A Loan.

17.  But at relevant times, defendant knew that co-schemer AlHusseini did not have sufficient assets to pay tens of millions of dollars to Investor Fund A in co-schemer AlHusseini's bank and brokerage accounts that were identified to Investor Fund A and Investment Adviser 1.

18.  Defendant and co-schemer AlHusseini prepared, or caused to be prepared, materially false and fraudulent bank and brokerage account statements that overstated the liquid assets in co-schemer AlHusseini's bank and brokerage accounts by tens of millions of dollars.

19.  Defendant and co-schemer AlHusseini sent, or caused to be sent, the false and fraudulent bank and brokerage account statements showing co-schemer AlHusseini's purported assets, by means of wire communications in interstate commerce, to Investment Adviser 1 and Investor Fund A to obtain the $55 million loan for defendant.

20.   In or around November 2021, defendant negotiated with Investment Advisor 1 to refinance the terms of the Investor Fund A Loan by taking out a new loan from Investor Fund B for $145 million.

21.   In or around November 2021, defendant and co-schemer AlHusseini sent, or caused to be sent, falsified bank and brokerage account statements, by means of interstate wires, containing materially false and fraudulent statements regarding co-schemer AlHusseini's purported assets to Investment Adviser 1 and Investor Fund B to obtain the $145 million loan for defendant.

22.   From in or around February 2020 and continuing until at least in or around October 2024, defendant concealed the scheme to defraud from Investment Adviser 1, Investor Fund A, and Investor Fund B.

23.   Additionally, beginning in or around October 2024, defendant negotiated the terms of a loan with Investment Manager 1, to be collateralized by defendant's shares in Company A.  In furtherance of the scheme and artifice to defraud lenders, defendant made and caused to be made materially false and fraudulent representations to Investment Manager 1 regarding the financial condition of Company A, including by providing and causing to be provided a copy of a letter purportedly signed by Company A's Audit Committee that falsely overstated Company A's available cash by hundreds of millions of dollars.

24.   Specifically, in furtherance of the scheme to defraud and to carry out an essential part of the scheme, on or about June 5, 2024, defendant sent an email via interstate wire from within the Central District of California to Individual 1 in Florida, attaching a letter purporting to be written and signed by members of

4

Company A's Audit Committee (the "Audit Committee Letter").  The Audit Committee Letter contained materially false representations that defendant knew to be false.  Among other things, the Audit Committee Letter stated that Company A had "a balance of cash and equivalents of at least $250,000,000."  In truth and in fact, Company A had a cash balance of less than $1,000,000 in June 2024.

25.  Defendant knowingly and intentionally sent the Audit Committee Letter to Individual 1 for the purpose of obtaining money or property by means of materially false or fraudulent pretenses and misrepresentations and with the intent to deceive and cheat. Defendant knew that the letter contained materially false representations and intended that the materially false representations would fraudulently influence others to part with money or property.

26.  The materially false and fraudulent statements in the Audit Committee Letter were capable of influencing, intended to influence, and did in fact influence Investment Manager 1's decision to loan defendant approximately $16,000,000 in or around January 2025.

III.  **False and Fraudulent Representations to Investors**

27.  Defendant also sent and caused to be sent false and fraudulent representations to investors seeking to invest in various assets related to Company A, including purchasing shares of Company A stock and making pooled investments to acquire debt securities issued by Company A through defendant.  In furtherance of the scheme, defendant caused Company A's revenue to be falsely inflated and misrepresented Company A's revenue and assets to induce those investments.

1    A. <u>Revenue Fraud</u>

2    28.  Beginning no later than January 2021, Company A established

3 a business line, known as "enterprise sustainability services," in

4 which Company A sold tree planting services to individuals and

5 companies interested in reducing their environmental impact.

6    29.  Beginning no later than January 2021, defendant solicited

7 small businesses and individuals, directly and through

8 intermediaries, to sign "Letters of Intent" with Company A.  The

9 Letters of Intent stated that each small business or individual

10 (collectively, the "LOI Customers") would pay for tens of thousands

11 of trees to be planted on a recurring monthly or quarterly basis at a

12 price of $1 per tree.

13    30.  Certain LOI Customers paid Company A for the tree planting

14 services described in the Letters of Intent with funds received from

15 defendant.  Defendant concealed from Company A investors that

16 defendant was the source of funds for the payments under the Letters

17 of Intent.  These certain LOI Customers were not bona fide purchasers

18 of the tree planting services from Company A.

19    31.  Between in or about March 2021 and November 2022, defendant

20 paid millions of dollars to LOI Customers, who then paid Company A.

21 At times, defendant paid the LOI Customers using money he received

22 from Company A.  For example, in or around January 2022, as a result

23 of defendant's actions, Company A entered into a 12-month, $8 million

24 advisory contract for business development services with one of

25 defendant's closely held entities, Sanberg Entity 1.

26    32.  On or about January 31, 2022, Company A paid Sanberg

27 Entity 1 $8 million.  The $8 million payment to Sanberg Entity 1 was

28 made using funds of investors in Company A.

33.    On or about March 14, 2022, defendant:

a.    Made two transfers of approximately $350,000 each from the prepaid $8 million from the bank account of Sanberg Entity 1 to defendant's personal checking account;

b.    Made two subsequent transfers of approximately $350,000 each from defendant's personal checking account to an account for another one of defendant's closely held entities, Sanberg Entity 2; and

c.    Made two more subsequent transfers to Company A for $350,000 each from the Sanberg Entity 2 bank account and listed the name of LOI Customer 1 and an invoice number in each wire instruction.

34.    Defendant also made or caused to be made additional payments to Company A directly from bank accounts held in the names of Sanberg Entity 2 and other closely held entities that defendant controlled.  To conceal from Company A's investors that defendant was in fact was the source of these funds, defendant made these payments to Company A purportedly on behalf of LOI Customers through the Sanberg Entity 2 bank account, and through other accounts in the names of other entities that defendant controlled.  Defendant concealed from Company A investors that he controlled Sanberg Entity 2 and the other closely held entities that defendant used to make payments to Company A on behalf of LOI Customers.

35.    On or about March 21, 2022, defendant knowingly sent encrypted messages via interstate wires using a smartphone application called "Signal" from within the Central District of California to Employee 1 of Company A in Arizona to carry out an essential part of the scheme.  Defendant informed Employee 1 via the

7

messages that the March 14, 2022 payments of $350,000 to Company A from Sanberg Entity 2 should be credited to LOI Customer 1.

36.    To conceal the scheme to defraud from Company A's investors, defendant's March 21, 2022 text messages to Employee 1 contained deceitful statements of half-truths, and statements that omitted material facts.  Defendant made such statements to Employee 1 with the intent to deceive and cheat Company A investors.

37.    At relevant times and to further conceal the scheme to defraud, defendant also instructed Company A not to contact the LOI Customers to conceal from Company A's investors and creditors that certain payments for tree planting services pursuant to Letters of Intent were made by or indirectly funded by entities controlled by defendant and not from the LOI Customers.

38.    From in or around March 2021 through in or around November 2022, Company A recognized as revenue the anticipated monthly and quarterly payments from each of the LOI Customers in the amounts specified in the Letters of Intent.  Company A recognized that revenue from the LOI Customers as being from arms-length third parties and not as related-party revenue from Company A's co-founder, defendant.

39.    The revenue booked from the LOI Customers materially misstated the recognized revenue of Company A such that Company A's financial statements were materially inaccurate.

40.    At relevant times, defendant knew Company A's financial statements materially misstated revenue from LOI Customers.  Knowing that Company A's financial statements materially misstated Company A's revenue, defendant knowingly and intentionally, through the use of interstate wires, solicited investors to purchase

8

securities to invest in Company A by means of materially false and fraudulent representations, and statements that omitted material facts.

B. Inflated Assets Fraud

41. In furtherance of the scheme to defraud, defendant also made, and caused to be made, materially false and fraudulent representations that materially overstated Company A's value and assets, including Company A's available cash, to multiple investors for the purpose of influencing their decision to purchase Company A stock or to make pooled investments to acquire debt securities issued by Company A.

42. From at least in or around June 2024 to in or around January 2025, defendant knowingly and intentionally made, and caused to be made, materially false and fraudulent representations that overstated Company A's available cash by hundreds of millions of dollars to investors for the purpose of influencing their decisions to invest in securities related to Company A.

IV.  **Conclusion**

43. From in or around August 2024 to at least in or around February 2025, defendant accepted and received, directly or indirectly, criminal proceeds of the wire fraud scheme. Defendant transferred at least approximately $6,650,000 to an account held in defendant's name at a financial institution, account number 41-01-100-0166771, knowing that the deposits were the proceeds of some form of unlawful activity, namely proceeds of the victim-lenders' and victim-investors' funds that defendant obtained from the wire fraud scheme.

44.   In accepting and receiving those victim-lenders' and victim-investors' funds, defendant deposited millions of dollars in unlawful proceeds from the scheme to defraud in an account with a financial institution.  The financial institution later loaned defendant more than $1 million because defendant posted the millions of dollars deposited to the account as collateral for the loan. Accordingly, defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense.

45.   Defendant's scheme to defraud lenders and investors involved sophisticated means as described above, including the use of sophisticated loan and investment structures, and multiple corporate entities, and defendant intentionally engaged in or caused the conduct constituting sophisticated means.

46.   In total, defendant's scheme to defraud lenders and investors involved 10 or more victims who sustained actual pecuniary harm, and victim losses are at least approximately $248,703,886.