TODD W. BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Acting Chief, Criminal Division
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorney
Major Frauds
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-2429
        Facsimile: (213) 894-0241
        E-mail:    Nisha.Chandran@usdoj.gov

LORINDA I. LARYEA
Chief, Fraud Section
Criminal Division, U.S. Department of Justice
THEODORE M. KNELLER (D.C. Bar No. 978680)
ADAM L.D. STEMPEL (D.C. Bar No. 1615015)
Trial Attorneys
U.S. Department of Justice
        1400 New York Avenue, NW
        Washington, DC 20530
        Telephone: (202) 514-5799
        Facsimile: (202) 514-3708
        Email: Theodore.Kneller@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:25-CR-200-SVW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION; DECLARATION OF THEODORE M. KNELLER; EXHIBITS |
| v. | |
| JOSEPH NEAL SANBERG, | Hearing Date: April 27, 2026 Hearing Time: 8:30 a.m. |
| Defendant. | Location:    Courtroom of the Hon. Stephen V. Wilson |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California, Assistant United States Attorney Nisha Chandran, United States Department of Justice Fraud Section Chief

Lorinda I. Laryea, Trial Attorneys Theodore M. Kneller and Adam L.D. Stempel, hereby files its sentencing position, along with exhibits comprising victim impact statements.

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, including the Presentence Investigation Report, and such further evidence and argument as the Court may permit.

Dated: April 13, 2026          Respectfully submitted,

TODD W. BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

LORINDA I. LARYEA
Chief, Fraud Section
U.S. Department of Justice

NISHA CHANDRAN
Assistant United States Attorney
Major Frauds

_____/s/_____
THEODORE M. KNELLER
ADAM L.D. STEMPEL
Attorneys for Plaintiff

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   OFFENSE CONDUCT.............................................2

      A.    Defendant's Scheme to Defraud Lenders..................3

      B.    Defendant's Scheme to Defraud Investors................4

      C.    Loss and Proceeds of the Scheme........................8

III.  ADVISORY SENTENCING GUIDELINES CALCULATION.................8

      A.    Stipulated Offense Characteristics.....................8

      B.    The Government Objects to the PSR's Application of a
            Zero-Point Offender Adjustment.........................9

IV.   GOVERNMENT'S SENTENCING RECOMMENDATION.....................12

      A.    History and Characteristics of Defendant..............12

      B.    The Substantial Losses to Numerous Victims Over an
            Extended Period Demand a Significant Sentence..........13

      C.    Defendant's Impact on a Broad Range of Victims
            Supports a Significant Sentence........................15

      D.    White-Collar Crimes Like Defendant's Are Particularly
            Susceptible to General Deterrence......................16

      E.    A Sentence at the Midpoint of the Guidelines is
            Sufficient But Not Greater than Necessary..............17

V.    RESTITUTION AND SUPERVISED RELEASE.........................18

VI.   CONCLUSION.................................................18

**TABLE OF AUTHORITIES**

**CASES**

In re CTN Holdings, Inc., 25-bk-10603-TMH (D. Del. Mar. 30, 2025)...2

United States v. AlHusseini, 2:24-mj-06166 (C.D. Cal. Oct. 8, 2024).4

United States v. AlHusseini, 2:25-cr-042-SVW (C.D. Cal. 2025).......2

United States v. Chee, 110 F.3d 1489 (9th Cir. 1997)...............10

United States v. Davis, 537 F.3d 611 (6th Cir. 2008)...............17

United States v. Martin, 455 F.3d 1227 (11th Cir. 2006)............16

United States v. Morris, 583 F. App'x 724 (9th Cir. 2014).........10

United States v. Nevell-Torrejon, 12 F. App'x 526 (9th Cir. 2001)..10

United States v. Rita, 551 U.S. 338 (2007).........................12

United States v. Santana, 908 F.2d 506 (9th Cir. 1990).............10

Witte v. United States, 515 U.S. 389 (1995)........................10

**STATUTES**

18 U.S.C. § 3553......................................... 12, 13, 16, 17

18 U.S.C. § 3663A.................................................18

18 U.S.C. § 3664............................................... 2, 18

**OTHER AUTHORITIES**

S. Rep. No. 98-255 (1983), reprinted in 1984 U.S.C.C.A.N. 3182.....16

Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After
   Booker, 47 Wm. & Mary L. Rev. 721 (2005).........................16

Stephen Breyer, The Federal Sentencing Guidelines and the Key
   Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1 (1988)....17

**U.S. SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1......................................... 8, 10, 11

U.S.S.G. § 3E1.1.................................................. 9

U.S.S.G. § 4C1.1.......................................... 1, 2, 9, 11

U.S.S.G. § 6A1.3.................................................10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant Joseph Sanberg is a serial fraudster who raised hundreds of millions of dollars in an effort to build an empire and a fortune based on lies. With a compelling rags-to-riches background and sterling educational and professional pedigree, Defendant positioned himself as a business mogul who would epitomize "doing well by doing good" through his environmentally friendly financial technology company. But from 2020 until his arrest in 2025, Defendant sustained his company and his reputation by spinning an expanding web of falsehoods. His lies caused many millions in losses to institutions and individuals who lent Defendant money, to investors in limited partnership entities that Defendant controlled, and to investors in the (now bankrupt) company, Aspiration Partners, Inc., which Defendant co-founded.

On October 15, 2025, Defendant pleaded guilty to two counts of wire fraud charged in a Superseding Information. See Dkt. 41, 43 and 58. The Superseding Information charged a scheme to defraud lenders and investors between 2020 and 2025 that resulted in victim losses of more than $248 million.

The Presentence Investigation Report dated January 5, 2026, (Dkt. 61, hereinafter "PSR") calculated a total offense level of 34 after calculating the specific offense characteristics agreed to in the plea agreement (Dkt. 43), applying a two-level downward adjustment for Zero-Point Offenders under U.S.S.G. § 4C1.1, and a Criminal History Category I, resulting in an advisory Guidelines range of 151 months to 188 months.  PSR at 4.  The government objects to the two-level reduction for a Zero-Point Offender Adjustment on

the basis that Defendant personally caused substantial financial hardship to at least one victim and is therefore ineligible for the two-level reduction.  See U.S.S.G. § 4C1.1(a)(6).  Therefore, the government respectfully submits that the Court should calculate Defendant's offense level to be 36 under the Sentencing Guidelines with an advisory guidelines range of 188 months to 235 months. Accordingly, the government recommends that Defendant be sentenced to the mid-point of the advisory guidelines range and be sentenced to 212 months' imprisonment followed by a three-year period of supervised release, a $200 special assessment, and ordered to pay full restitution.  Furthermore, as described below, the government is close to finalizing its restitution position and therefore requests that the Court set a date for the final determination of restitution, not to exceed 90 days after sentencing pursuant to 18 U.S.C. § 3664(d)(5).

## II.  OFFENSE CONDUCT

Defendant was the co-founder of Aspiration Partners, Inc.,[1] a Los Angeles County company that offered financial services and, at various times, carbon-reducing tree planting services to customers to offset emissions. PSR ¶¶ 12, 38. Defendant and Ibrahim AlHusseini served on the board of directors of Aspiration and engaged in fraud in connection with the company. PSR ¶¶ 12, 15.  AlHusseini pleaded guilty before this Court on March 3, 2025, to one count of wire fraud concerning his role in defrauding two lenders with Defendant. See United States v. AlHusseini, 2:25-cr-042-SVW (C.D. Cal. 2025); Dkt.

---

[1] Aspiration is referred to in the Superseding Information and Plea Agreement as "Company A." It is now engaged in Chapter 7 bankruptcy proceedings under the name CTN Holdings, Inc.  See In re CTN Holdings, Inc., 25-bk-10603-TMH (D. Del. Mar. 30, 2025).

43.

### A.    Defendant's Scheme to Defraud Lenders

Over the course of approximately five years, Defendant repeatedly lied to multiple private lenders so Defendant could obtain multiple multi-million-dollar loans.  Specifically, Defendant repeatedly lied about the value of the collateral and loan guarantees to induce the private lenders to lend millions of dollars to Defendant.

Beginning in January 2020, Defendant negotiated terms for a loan from Investor Fund A of approximately $55 million for the benefit of Defendant and others. PSR ¶ 24.  Under the terms of the $55 million loan, Defendant pledged approximately 10.3 million shares of Aspiration stock as collateral. To secure the Investor Fund A loan, Defendant and AlHusseini arranged a separate financial guarantee by obligating AlHusseini to purchase the Aspiration stock posted as collateral from Investor Fund A for tens of millions of dollars if Defendant defaulted on the loan. PSR ¶¶ 24-25. Defendant knew that the guarantee was a material part of the $55 million loan. PSR ¶ 26.

But AlHusseini did not have enough assets to cover his obligations under the guarantee, so Defendant and AlHusseini falsified bank and brokerage statements to falsely inflate AlHusseini's personal assets by tens of millions of dollars and fraudulently secure the loan for Defendant. PSR ¶¶ 26, 28-29.

In November 2021, Defendant refinanced the $55 million loan with a new loan for $145 million. PSR ¶ 30. Once again, Defendant and AlHusseini sent falsified bank and brokerage statements that inflated the assets in AlHusseini's accounts to obtain the $145 million loan. PSR ¶ 31. Defendant concealed the scheme from the lender until at

least October 2024. PSR ¶ 32.

This was not the only time Defendant executed a scheme to defraud lenders. Between October 2024 and January 2025, Defendant's brazen fraud reached new heights when he sought to use falsified financial documents to fraudulently obtain a new multi-million-dollar loan from yet another private lender.  Defendant continued to pursue this loan even after defendant's co-schemer and Aspiration board member, AlHusseini, was arrested on October 7, 2024, and detained for two weeks in Los Angeles on charges brought by the Department of Justice and the U.S. Attorney's Office for the Central District of California.  See United States v. AlHusseini, 2:24-mj-06166 (C.D. Cal. Oct. 8, 2024).

Even though AlHusseini had been arrested and detained for two weeks after Defendant and AlHusseini executed their scheme to defraud a different private lender for $145 million, Defendant, undeterred, pushed forward with yet another audacious scheme to fraudulently obtain a new loan.  Defendant again sought to collateralize the new loan with his shares of Aspiration. PSR ¶ 33. This time, Defendant falsely represented the financial condition of Aspiration, including by providing a copy of a falsified letter purportedly signed by Aspiration's Audit Committee that falsely stated that Aspiration had "a balance of cash and equivalents of at least $250,000,000." PSR ¶ 33-35. In fact, Aspiration had a cash balance of less than $1,000,000 in the month that the letter was dated. PSR ¶ 34. The false statements in the letter induced Investment Manager 1 to loan Defendant approximately $16,000,000 in January 2025. PSR ¶ 36.

**B.    Defendant's Scheme to Defraud Investors**

Defendant also made false and fraudulent representations to

4

investors seeking to invest in various securities related to Aspiration, including purchasing shares of Aspiration stock and making pooled investments to acquire stock or debt securities issued by Aspiration. PSR ¶ 37. Defendant fraudulently induced investments in at least two ways: (1) by generating the false appearance of revenue through sham customer payments that caused Aspiration to inflate the company's revenue, and (2) by creating and providing falsified financial documents that falsely overstated Aspiration's assets by hundreds of millions of dollars. PSR ¶ 37.

Beginning around January 2021, Aspiration established a business line, known as "enterprise sustainability services," in which Aspiration sold carbon-offsetting tree planting services to individuals and companies interested in reducing their environmental impact. Aspiration solicited small businesses and individuals, directly and through intermediaries, to sign "Letters of Intent" with Aspiration.  The Letters of Intent stated that each small business or individual (collectively, the "LOI Customers") would pay for tens of thousands of trees to be planted on a recurring monthly or quarterly basis at a price of $1 per tree.  PSR ¶¶ 38-39.

Unsatisfied with the pace of growth of Aspiration's enterprise sustainability services, Defendant engaged in a fraudulent scheme to recruit numerous sham LOI Customers whose letters of intent would commit them to pay Aspiration tens of thousands of dollars per month for tree planting services.  PSR ¶ 38-40.  Defendant's sham customers frequently were unaware of, had no intention to, and did not have the means to pay Aspiration for such services.  To deceive the company's investors into believing that the LOI Customers were bona fide, Defendant gave money to the sham LOI Customers to pay Aspiration, or

Defendant made payments in the name of LOI Customers directly to Aspiration through closely held legal entities that Defendant controlled.  Dkt. 43 at ¶ 34; PSR ¶ 44.

Between March 2021 and November 2022, Defendant concealed that he was the source of millions of dollars paid to Aspiration through, or purportedly on behalf of, the sham LOI Customers. At times, Defendant concealed Ponzi-like payments to Aspiration.  For example, in January 2022, Defendant secured an $8 million payment from Aspiration that was purportedly for Defendant's advisory and business development services to the company. PSR ¶ 41.  Aspiration paid Defendant the $8 million using investors' funds.  Unbeknownst to the company's investors, Defendant then used the $8 million to make sham payments to Aspiration as if the payments were from LOI Customers paying for tree planting services.  PSR ¶ 41.

Defendant concealed from Aspiration and investors that Defendant (or Aspiration investors' funds) were the source of funds for the payments under the Letters of Intent. PSR ¶ 40. To further conceal his fraud, Defendant instructed Aspiration employees not to contact the LOI Customers to prevent Aspiration employees from discovering that Defendant was the source of the payments. PSR ¶ 46.

From in or around March 2021 through in or around November 2022, Aspiration recognized as revenue the anticipated monthly and quarterly payments from each of the LOI Customers in the amounts specified in the Letters of Intent. PSR ¶ 47. Aspiration then booked these customer agreements as legitimate revenue from bona fide customers, when in fact they were round-tripped payments from Defendant, funded unknowingly by Aspiration's own investors. As a result, the hundreds of thousands of dollars in revenue booked from

6

the LOI Customers, which the company expected to receive each month going forward, substantially and materially overstated Aspiration's revenue such that Aspiration's financial statements were materially inaccurate. PSR ¶ 47-48. Knowing that Aspiration's financial statements materially misstated Aspiration's revenue, Defendant continued to solicit investors to invest in Aspiration. PSR ¶ 49.

Additionally, from around June 2024 to January 2025, even after AlHusseini's arrest in October 2024, Defendant made false and fraudulent representations to multiple investors on multiple occasions that overstated Aspiration's value, assets, and available cash by hundreds of millions of dollars for the purpose of inducing investments in Aspiration securities. PSR ¶ 50-51. During this period, Defendant fraudulently induced dozens of new victims to invest or lend tens of millions of dollars based on false and entirely fabricated claims, including, for example, by sending to victims a false and fraudulent Audit Committee letter that overstated Aspiration's cash-on-hand to be $250,000,000 (when it actually had a cash balance of $1,000,000).  At a time when Aspiration was essentially broke and its primary prospects for revenue were through the tree planting services that Defendant propped up with sham customers and Ponzi-payments, Defendant lured more investor victims with the promises of a financially sound and prospering company.  As described in Sections III.B and IV.C below, Defendant fraudulently enticed many victims to invest substantial portions of their retirement savings in a project that they believed was safe and thriving, while simultaneously helping save the planet by supporting environmental health through carbon reduction.  To keep the money flowing to Aspiration, Defendant preyed on both his victims' desire

to invest in a solid company and their altruism.  But Defendant's lies and falsities cost his victims dearly.

### C.    Loss and Proceeds of the Scheme

Defendant has admitted that his scheme to defraud lenders and investors involved 10 or more victims who sustained actual pecuniary harm, and victim losses totaling at least approximately $248,703,886. Dkt. 43 at ¶ 46; PSR ¶ 55.

From at least August 2024 and continuing up until his arrest on March 3, 2025, Defendant knowingly stole $6,650,000 in proceeds from his wire fraud scheme and diverted them to a personal investment management account in his name. PSR ¶¶ 52-53. Defendant's scheme to defraud lenders and investors involved sophisticated means, including the use of sophisticated loan and investment structures and multiple corporate entities, and Defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense. Dkt. 43 at ¶¶ 44-45; PSR ¶¶ 53-54.

## III. ADVISORY SENTENCING GUIDELINES CALCULATION

### A.    Stipulated Offense Characteristics

The plea agreement stipulates, and the PSR finds, the applicability of the following offense characteristics:

| | | |
|---|---|---|
| Base offense level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss greater than $150 million and less than $250 million: | +26 | U.S.S.G. § 2B1.1(b)(1)(N) |
| 10 or more victims: | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(i) |
| Offense involved sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Defendant derived more than $1 million in gross receipts | +2 | U.S.S.G. § 2B1.1(b)(17)(A) |

8

from a financial institution
as a result of the offense:

Acceptance of Responsibility        -3                U.S.S.G. § 3E1.1

**TOTAL OFFENSE LEVEL**              36

Dkt. 43 at ¶ 13.

The government is unaware of any criminal history.

**B.    The Government Objects to the PSR's Application of a Zero-Point Offender Adjustment**

The government objects to paragraph 86 of the PSR, dated January 5, 2025, finding that defendant was eligible for a two-level reduction for a Zero-Point Offenders adjustment under U.S.S.G. § 4C1.1 and thus reducing defendant's Total Offense Level by two levels from 36 to 34. PSR ¶ 86-87. Based on information from victims described below, the government respectfully objects to the application of the two-level downward Zero-Point Offender adjustment because Defendant does not meet the eligibility requirement in U.S.S.G. § 4C1.1(a)(6), which requires that a defendant did not personally cause substantial financial hardship to any victim.

In determining whether the offense resulted in substantial financial hardship to a victim, the Court shall consider, among other factors, whether the offense resulted in the victim (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or

9

her ability to obtain credit.  See U.S.S.G. § 2B1.1 Application Note 4.F.

Following defendant's arrest in March 2025, the government has received multiple victim impact statements[2] in which Defendant's victims described losses resulting in substantial financial hardship. (Declaration of Theodore M. Kneller ("Kneller Decl."), Exhibits 1 – 4.)  For example, victims E.K. and M.K., first-generation Americans in their 70s, lost more than $1.4 million from their investment in Aspiration through one of Defendant's limited partnerships in which victims E.K. and M.K. executed a subscription agreement with Defendant.  Exhibit 1 at 1, 5.  E.K. and M.K.'s $1.4 million loss represented 40 years of savings – their entire individual retirement accounts ("IRAs") – "and have severely reduced [their] safety net." Exhibit 1 at 5.  Thus, Defendant personally caused victims M.K. and E.K. to suffer substantial financial hardship resulting in a substantial loss to a retirement or other savings or investment fund. See U.S.S.G. § 2B1.1 Application Note 4.F(iii).

According to victim K.G.'s victim impact statement, K.G. received Aspiration growth projections from Defendant and invested more than $390,000 from a Roth IRA and a government retirement Thrift

---

[2] At sentencing, the Court may consider "[a]ny information..., so long as it has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3 commentary, citing Witte v. United States, 515 U.S. 389, 399-401 (1995).  The Court may use victim impact statements for purposes of sentencing.  See United States v. Santana, 908 F.2d 506, 507 (9th Cir. 1990)(upholding "the use of victim impact statements for sentencing"); see also United States v. Nevell-Torrejon, 12 F. App'x 526, 527 (9th Cir. 2001)(district court did not abuse its discretion in considering victim impact statements at sentencing that bore minimal indicia of reliability); United States v. Morris, 583 F. App'x 724, 726 (9th Cir. 2014)(same)(citing United States v. Chee, 110 F.3d 1489, 1492 (9th Cir. 1997)).

Savings Plan (TSP) account. Exhibit 2 at 1-4.  As a result of K.G.'s losses from Defendant's fraud, K.G. expects "to return to work after [K.G.'s] children are adults during the years that should have been [K.G.'s] full retirement."  Exhibit 2 at 3.  Thus, Defendant personally caused Victim K.G. to suffer substantial financial hardship resulting in substantial (1) loss to a retirement or other savings or investment fund, and (2) changes to employment by postponing retirement plans.  See U.S.S.G. § 2B1.1 Application Note 4.F(iii) and (iv).

According to victim Y.B.'s victim impact statement, Y.B. lost $100,000 from a Roth IRA that she saved when she was a recent immigrant from India while raising three children under the age of 10.  The loss of the $100,000 "shattered" Y.B.'s plans to use the money for long-term health care in retirement.  Exhibit 3 at 1. Thus, Defendant personally caused victim Y.B. to suffer substantial financial hardship resulting in a substantial loss to a retirement or other savings or investment fund.  See U.S.S.G. § 2B1.1 Application Note 4.F(iii).

Based on the foregoing, Defendant personally caused substantial financial hardship to one or more victims and is therefore not eligible for the two-level downward Zero-Point Offender adjustment under U.S.S.G. § 4C1.1.  If the Court finds that Defendant personally caused one or more victims substantial financial hardship, the offense level calculation should be 36 and the advisory Guidelines range should be 188 to 235 months' imprisonment. The government's recommendation of 212 months falls at the mid-range of an offense level of 36.

## IV. GOVERNMENT'S SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a). United States v. Rita, 551 U.S. 338, 348 (2007). Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." Id. at 350.

Under 18 U.S.C. § 3553(a)(1), the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant. Furthermore, the Court should consider the need for the sentence imposed to: (i) reflect the seriousness of the offense, (ii) promote respect for the law, (iii) provide just punishment, (iv) afford adequate deterrence, (v) protect the public, and (vi) avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(2),(6).

### A. History and Characteristics of Defendant

Defendant's crimes were crimes of choice, not necessity. A Harvard University graduate (PSR ¶ 123), by Defendant's own account, he made $25 million in income between 2002 and 2012 working at major financial firms like Blackstone and Tiger Global. PSR ¶ 128. Defendant, through the company that he co-founded, sold others on Aspiration's promise of altruism and promoting environmental protection. Through Aspiration, Defendant gained access to famous, rich, and powerful people, many of whom Defendant persuaded to promote his company. Yet when the company began to falter, rather than honestly face a business failure, Defendant chose to turn to lies and fraud no matter the consequences, costing his victims hundreds of millions of dollars.

12

Defendant used the credentials and network he developed in the financial industry to build trust with victims – trust that he then betrayed with a years-long series of lies and falsehoods that resulted in unbelievable financial harm to victims large and small.

### B.    The Substantial Losses to Numerous Victims Over an Extended Period Demand a Significant Sentence

The scale, length, and sophistication of defendant's scheme warrant a guideline sentence to provide just punishment.  But they also demonstrate the need for a sentence sufficient to protect the public from defendant's further crimes and afford adequate deterrence.  See 18 U.S.C. § 3553(a)(2)(A),(B), (C).

Defendant's fraud caused at least $248 million in losses to more than 130 victims.  Dkt. 43 at ¶ 46; PSR ¶ 65.  This is a staggering figure that, even standing alone, counsels in favor of a substantial sentence of incarceration.

Notably, Defendant did not commit his crimes in one fell swoop, and the enormity of the losses he caused were not merely attributable to a single act of fraud. The fraud unfolded over five years, on numerous occasions, and in different ways. Rather than sticking to one lie, Defendant fabricated new lies to keep his fraud going, adapting his deception to suit his victims and his needs, each time choosing again and again to expand his fraud and increase his damage to victims. Initially, Defendant recruited AlHusseini, a fellow board member of Aspiration, to help him falsify bank and brokerage statements to guarantee a massive loan that Defendant wanted. Then Defendant inflated Aspiration's revenue by obtaining investors' funds from the company under the guise of providing business development services and then secretly funneling the money back to Aspiration

13

purportedly as revenue to make the company appear to be successful and growing, all to expand his fraud to new investors and lenders.

Defendant did not stop defrauding new victims when he learned of a federal investigation of Aspiration and the revenue fraud scheme he had been conducting. Nor did he stop after his co-schemer from the early part of the fraud scheme, Ibrahim AlHusseini, was arrested in October 2024. To the contrary, Defendant was not deterred and continued to defraud new victims and raise more money from investors and lenders. He never stopped -- indeed, he induced new investments and loans based on false pretenses up until his arrest in March 2025.

This is not the behavior of a selfless man who merely broke the law on one occasion. It is the behavior of a seasoned fraudster who lied and lied to keep his fraud going, no matter the cost to his victims. Although defendant has reported to Probation that he invested (and lost) his own money in the now-bankrupt Aspiration, PSR ¶ 60, this conduct bears none of the hallmarks of a selfless act. Any claim of selflessness is belied by the fact that Defendant stole $6,650,000 million of victims' money and secretly diverted it to his personal investment account. PSR ¶ 52.

To promote the business that Defendant founded and in which he owned a substantial interest, Defendant demonstrated that he was willing to say anything, regardless of its truth. Defendant's lies were not a one-off occurrence, nor were they anything like the kind of aspirational "puffery" common among ambitious start-up company founders. Defendant's misrepresentations were false, fake, and facially fraudulent and they were repeated, deliberate, and material. They caused victims to lose hundreds of millions of dollars. It is one thing to gamble on a risky business with one's own money. But

that's not what happened here:  it is a crime to steal the hard earned money of others with lies.

As Defendant has admitted, he did in fact benefit from his fraud, even if he also suffered losses. Not only were the loans he fraudulently obtained "for the benefit of Defendant and others," PSR ¶ 24, but during the final six months of the scheme Defendant misappropriated at least $6,650,000 of victims' money. PSR ¶¶ 52-53. The Court should not overlook this in weighing Defendant's claims that he was not "self-serving [or] greedy." See PSR ¶ 60.

**C.    Defendant's Impact on a Broad Range of Victims Supports a Significant Sentence**

Defendant defrauded people and entities large and small, from individuals who wired Defendant a few thousand dollars they had saved, all the way up to large private credit funds and institutional investors. Many of the largest investors were institutions and professional investors who were duped by his false promises and the sophisticated nature of Defendant's scheme.

Defendant's action has resulted in significant harm to many victims who relied on Defendant's claims that Aspiration was financially sound, growing, and benefiting the world.  Many believed Defendant and invested substantial sums from their personal retirement savings.  For example, in addition to the victims described in Section III.B. above, Victim M.D. invested and lost nearly $300,000 -- the majority of his retirement savings -- with Defendant because victim M.D. trusted Defendant personally. Both victim M.D. and his spouse have had to postpone their retirements. Exhibit 4.

15

These are just some of the more than 100 victims who have sent statements to the government concerning their financial losses as a result of Defendant's fraud. The government is continuing to receive submissions from victims around the world who lost significant investments. The Court should impose a substantial punishment to reflect the seriousness of the offense and to provide just punishment.  See 18 U.S.C. § 3553(a)(2)(A).

D.    **White-Collar Crimes Like Defendant's Are Particularly Susceptible to General Deterrence**

Defendant's crimes have been highly publicized and were committed on a significant scale over an extended period. In cases such as this, the general deterrent value of a long sentence of imprisonment is clear: more potential offenders are likely to hear about it and be deterred from making similarly damaging choices.

Economic crimes like Defendant's are quintessentially deterrable so long as they are met with significant terms of imprisonment. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After *Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)).  In fact, Congress, in drafting § 3553, confirmed that this common-sense principle was one of the driving forces for including deterrence among the goals of sentencing.  See S. Rep. No. 98-255, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259d ("To deter others from committing the offense . . . is particularly important in the area of white collar crime.").  Congress was, in fact, expressly concerned with the fact

16

that "[m]ajor white collar criminals often are sentenced to . . . little or no imprisonment," which the offenders disregard as "a cost of doing business."  Id.

The same is true of the sentencing guidelines, where one of the "central reasons" for their creation was ensuring "stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes."  United States v. Davis, 537 F.3d 611, 617 (6th Cir. 2008); see also Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 20 (1988) (discussing the Sentencing Commission's efforts to increase the severity of punishments for white-collar offenses to eliminate the disparity with theft offenses).

Here, in particular, where Defendant told lies for years to a multitude of victims and continued to raise money from victims even after his co-schemer was arrested, the importance of deterring Defendant from future fraud crimes is heightened. A 212-month sentence serves the interest of achieving deterrence here, both for Defendant himself and for others who would follow his path.  See 18 U.S.C. § 3553(a)(2)(B).

### E.    A Sentence at the Midpoint of the Guidelines is Sufficient But Not Greater than Necessary

Section 3553(a) prescribes that a sentence must be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. As explained above, a sentence below Defendant's guideline range would fail to comply with those purposes. Given the significant guideline range defendant faces, coupled with his acceptance of responsibility, a sentence at the midpoint of that

17

range is appropriate: 212 months within the advisory Guidelines range of 188 months to 235 months.

Defendant was arrested on March 3, 2025. Defendant entered his plea agreement on August 20, 2025, in which he agreed to accept responsibility and pay full restitution. For a case of this temporal scope, complexity, and seriousness, Defendant's acceptance of responsibility was comparatively prompt, reducing the burden on the Court, the government, and Defendant's victims. The nature of Defendant's acceptance of responsibility informs the government's recommendation for the midpoint (212 months) of the advisory range.

**V.     RESTITUTION AND SUPERVISED RELEASE**

As the PSR correctly notes, restitution is mandatory in this case under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and the government requests that this Court order restitution in full.

The government has collected a substantial number of claims from over 130 victims of Defendant's offenses, which it has provided to defense counsel and the Probation Office, and a small number of additional claims may be forthcoming. The government is in the process of finalizing its restitution position. Therefore, the government requests that the Court set a date for the final determination of restitution, not to exceed 90 days after sentencing pursuant to 18 U.S.C. § 3664(d)(5).

The government agrees with the PSR's recommendation of a three-year term of supervised release to follow defendant's incarceration.

**VI.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 212 months' imprisonment,

18

followed by three years of supervised release, and a special assessment of $200, with restitution to be ordered at the deferred hearing.